IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHANE STEVENS<br>104 Moore Ave.<br>Barrington, NJ 08007 | CIVIL ACTION |
| Plaintiff,<br>v. | DOCKET NO.: |
| BROWN'S SUPER STORES, INC.<br>d/b/a ShopRite of Brooklawn<br>Rte 130 & Browning Road<br>Brooklawn, NJ 08030 | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CIVIL ACTION COMPLAINT

Shane Stevens (*hereinafter* referred to as "Plaintiff," unless indicated otherwise), by and through his undersigned counsel, hereby avers as follows:

### INTRODUCTION

1. This action has been initiated by Plaintiff against Defendant for violations of Title VII of the Civil Rights Act of 1964 ("Title VII" - 42 U.S.C. §§ 2000d *et. seq.*) and the New Jersey Law Against Discrimination ("NJ LAD"). Plaintiff asserts, *inter alia*, that he was unlawfully terminated by Defendant. As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

### JURISDICTION AND VENUE

2. This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under the laws of the United States.

3. This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the

1

standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because substantially all of the events or omissions giving rise to the claims set forth herein occurred in this judicial district, in addition, venue is properly laid in this district because Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the District of New Jersey for purposes of this action.

5. Plaintiff is proceeding herein under Title VII and has properly exhausted his administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a Notice of Right to Sue letter from the EEOC.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult male individual with an address as set forth in the above-caption.

8. Defendant Brown's Super Stores, Inc., d/b/a ShopRite of Brooklawn (*hereinafter* "Defendant"), is a for-profit entity incorporated under the laws of Pennsylvania, doing business as an operator of approximately ten (10) "ShopRite" grocery stores in the Delaware Valley, including in New Jersey at an address as set forth in the above-caption (the location at which Plaintiff worked), also known as "ShopRite of Brooklawn."

9. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. In or about October of 2015, Plaintiff was hired and began working for Defendant at its Brooklawn, New Jersey, grocery store location (also known as "ShopRite of Brooklawn," *hereinafter* "Brooklawn location").

12. At the time of Plaintiff's hiring with Defendant, his title was Loss Prevention Detective; Plaintiff would later be promoted to Loss Prevention Manager (described further *infra*).

13. Throughout his employment with Defendant, Plaintiff was a dedicated and hard-working employee who performed his job well.

14. In or about early 2016, Plaintiff began hearing hostility (including sex-related insults) from Defendant's Human Resources Manager, Bryan Minerva (*hereinafter* Mr. Minerva) about the Front End Manager, A.G., female (*hereinafter* "AG"); for example[1]:

   a. Mr. Minerva referred to AG as "prude," "ugly," "a drug addict," "liar," "terrible person," and a "horrible employee";

   b. Upon information and belief, Mr. Minerva stating AG was a "horrible employee" had nothing to do with AG's objective work performance, as:

---

[1] Not intended to be an exhaustive list.

3

      i. In the same breath Mr. Minerva would call AG a bad employee, he would also make comments as to AG's appearance and sexual proclivity (discussed *supra*), which had nothing to do with AG's legitimate work performance; and

      ii. Plaintiff heard Mr. Minerva mention that he had asked AG out socially/romantically (in or about 2015, prior to Mr. Minerva exhibiting open hostility toward AG/AG's sex), and AG had declined Mr. Minerva.

15. During Plaintiff's employment and at all times relevant herein, Mr. Minerva was the Human Resources Manager for Defendant's Brooklawn location (the only H.R. Manager on site), the same location at which Plaintiff and AG worked during times relevant to this action.

16. In or about 2016, after first hearing sexual harassing remarks and exhibited hostility from H.R. Manager Mr. Minerva about the female Front End Manager, AG (described *supra*), Plaintiff began being subjected to unwelcome and harassing sexual comments at work about Plaintiff and AG, such as[2]:

    a. Repeatedly being asked if he thought AG was attractive;

    b. Being told "have fun banging [AG]"; and

    c. Being told "have fun f\*\*king [AG]."

17. The sexually-harassing comments Plaintiff was subjected to (described *supra*), were made by Plaintiff's co-workers as well as superiors, including but not limited to Evan Gilbert (Senior Loss Prevention Manager), and Kyle Smith (Loss Prevention Manager and Plaintiff's direct supervisor while Plaintiff was a Loss Prevention Detective, *hereinafter* "Mr. Smith"). Upon information and belief, H.R. Manager - Mr. Minerva perpetuated sexually-

---

[2] Not intended to be an exhaustive list.

4

harassing rumors and comments about Plaintiff and AG (as Mr. Minerva had, and continued, exhibiting open hostility towards AG and AG's sex in front of Plaintiff, described *supra*).

18. Upon information and belief, Plaintiff also was treated disparately on account of his sex by Defendant's management; for example, in or about 2016 (after first hearing sexual harassing comments from management, *supra*), Plaintiff witnessed his supervisor (Mr. Smith) and CSM Manager, Mary Gray ("Ms. Gray"), meeting to rearrange Plaintiff's schedule so that it did not coincide with a female employee's (AG's), despite that Ms. Gray (AG's supervisor) normally would have no involvement with the scheduling of Loss Prevention Detectives (such as Plaintiff) and there was no discernible work-related reason why Plaintiff's schedule was being rearranged.

19. In or about August of 2016 (before complaining of sexual harassment, described *infra*), Plaintiff was promoted from Loss Prevention Detective to Loss Prevention Manager of Defendant's Brooklawn location.

20. In or about the Fall of 2016, Plaintiff was subjected to continued sexual harassment, as described *supra*, and continued hostile comments about AG and AG's sex from H.R. Manager, Mr. Minerva.

21. On or about November 19, 2016, Plaintiff complained of the aforesaid sexual harassment to his direct supervisor, Craig Gage (Loss Prevention Director, *hereinafter* "Mr. Gage"); Plaintiff told Mr. Gage he felt "sexually harassed" because of the aforesaid sexual comments from other employees, and that Plaintiff believed AG was also being subjected to sexual harassment by other employees and management, including but not limited to Human Resources Manager, Mr. Minerva.

22. On or about November 19, 2016, Plaintiff's aforementioned complaint of sexual harassment to Mr. Gage was *immediately* met with hostility, for example[3]:

   a. Mr. Gage quickly became argumentative and tried to dismiss Plaintiff's complaint of sexual harassment: telling Plaintiff "enough," that Plaintiff was "wrong" about his allegation of sexual harassment, and that Mr. Gage did not want to hear about it (i.e. on-going sexual harassment in the workplace);

   b. Mr. Gage began raising pre-textual performance concerns about Plaintiff, despite Plaintiff's performance being overall consistent and positive;[4] and

   c. Mr. Gage repeatedly attempted to dismiss Plaintiff's concerns or divert the meeting; however, Plaintiff continued to respectfully try and have Mr. Gage address the sexual harassment issue, eventually resulting in Mr. Gage telling Plaintiff he would set Plaintiff up for a meeting with Dan Midgette (Defendant's Labor Relations Manager, hereinafter "Mr. Midgette").

23. On or about November 22 or 23, 2016, in the week following Plaintiff's aforesaid meeting with Mr. Gage, Plaintiff complained to Defendant Labor Relations Manager, Mr. Midgette, about the aforementioned ongoing sexual harassment in the workplace; Plaintiff specifically told Mr. Midgette that he felt sexually harassed and that he believed AG was being subjected to sexual harassment as well.

---

[3] Not intended to be an exhaustive list.

[4] During the aforesaid meeting with Mr. Gage (on or about November 19, 2016), also present was Matt Macaferty, a manager in charge of safety for all Defendant's stores. Macaferty himself had recently visited/evaluated Defendant's Brooklawn location, including its Loss Prevention (for which Plaintiff was responsible), and commended the good performance from Plaintiff and his team. In the meeting with Mr. Gage and Macaferty, Plaintiff pointed out that his store had just been positively reviewed by Macaferty, which was nonetheless dismissed: eventually Plaintiff was forced to sign a performance form stating things he had done incorrectly (although Plaintiff disagreed).

6

24. During Plaintiff's November 22 or 23, 2016 meeting with Mr. Midgette (described *supra*), Plaintiff continued to be met with hostility from Defendant's management in response to his complaints of sexual harassment, such as by Mr. Midgette telling Plaintiff that a manager Plaintiff had complained about in regards to sexual harassment was "just joking around."

25. Furthermore, during his aforesaid November 22 or 23, 2016 meeting with Mr. Midgette, Plaintiff <u>specifically complained to Mr. Midgette that Plaintiff feared retaliation from Mr. Gage</u> because of the hostility and dismissiveness he experienced from Mr. Gage when Plaintiff had first complained to him of sexual harassment (described *supra*).

26. Upon information and belief, Defendant never properly investigated nor resolved Plaintiff's multiple complaints of sexual harassment; for example, in response to Plaintiff's aforementioned complaints during their meeting, Mr. Midgette told Plaintiff that the harassment would be stopped and that Plaintiff did "not have to worry" about retaliation from Mr. Gage for having complained to him of sexual harassment; *however*, <u>approximately one week later, Plaintiff was terminated by **both** Mr. Gage and Mr. Midgette,</u> for completely pretextual reasons (described further *infra*).

27. On or about November 30, 2016, *within two weeks* of Plaintiff's first complaints to Defendant's management about sexual harassment (of both himself and AG), and subsequent complaints of retaliation/fear of retaliation for complaining about sexual harassment to Mr. Gage (described *supra*), Plaintiff was terminated by Defendant in a meeting with Mr. Gage and Mr. Midgette.

7

28. The purported reason for Plaintiff's discriminatory/retaliatory termination was because he violated Defendant's fraternization policy with AG, which was completely pretextual considering:

   a. Defendant's fraternization policy was vague and not regularly enforced:

      i. Employees, including managers, violated the policy and were not noticeably disciplined or terminated;

      ii. H.R. Manager Mr. Minerva had dated multiple other employees and made it known in the workplace: openly talking at work about having personal and sexual relations with Brooklawn location employees (who Mr. Minerva would have had some authority over as the on-site Human Resources Manager); and

      iii. Upon information and belief, H.R. Manager Mr. Minerva had previously asked AG (whom Defendant alleged Plaintiff violated the policy with) to go on a date while they both worked at Defendant's Brooklawn location.

   b. Plaintiff <u>had just complained to these very same managers</u>, Mr. Gage and Mr. Midgette, about ongoing sexual harassment *towards* himself and AG; however, no mention was made of any <u>proper</u> investigation into Plaintiff's concerns, and no other employee of Defendant was noticeably disciplined in connection with Plaintiff's complaints (with the apparent exception of Plaintiff);

   c. Mr. Gage did not accuse Plaintiff of letting a personal relationship affect his work performance; instead, **Mr. Gage presented Plaintiff with a picture supposedly showing AG's personal vehicle parked near Plaintiff's home** (i.e. clearly not on work time). Plaintiff was not told how Defendant obtained the picture, which

8

was an obvious invasion of Plaintiff's personal privacy, and clearly shows that Defendant's management (including but not limited to Mr. Gage and/or Mr. Midgette) was targeting Plaintiff (<u>even at his own home</u>) because of Plaintiff's recent complaints of sexual harassment towards himself and AG, as well as Plaintiff's complaints of retaliation/feared retaliation from Mr. Gage for complaining to him about sexual harassment[5];

d. Despite Plaintiff being terminated for allegedly violating Defendant's fraternization policy with AG (a similarly-situated management employee), AG was not terminated nor noticeably disciplined; and

e. During the termination meeting, immediately after Mr. Gage informed Plaintiff he was being terminated, Labor Relations Manager, Mr. Midgette, attempted to have Plaintiff sign a severance agreement, which stated Plaintiff was releasing all claims against Defendant, including those under Title VII and the NJLAD (an agreement that Plaintiff did not sign).[6]

---

[5] Needless to say: upon information and belief, Defendant did not normally procure pictures of employees' personal vehicles and residences they suspected of fraternizing.

[6] *See e.g. Staffieri v. Northwestern Human Servs.*, 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. May 22, 2013)(an employer who offered severance when policies did not require upon condition of waiving FMLA claim supported finding of pretext in FMLA claim among other facts); *See also Bartlett v. NIBCO Inc.*, 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011)("Severance pay packages contingent upon a release of claims which are offered *contemporaneously with the notice of termination* are *not* covered by [Rule 408]", and the motive in offering same is admissible evidence in a retaliation claim and is admissible at trial in this case); *Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011)(severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by FRE 408); *EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267 (D. Nev. 2009)(denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy).

29. Plaintiff therefore believes and avers he was subjected to a hostile work environment and terminated due to [1] his complaints of sexual harassment and retaliation for complaining of sexual harassment and/or [2] his sex.

## Count I
## Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
([1] Sex Discrimination [2] Retaliation [3] Hostile Work Environment)

30. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

31. Plaintiff was subjected to sexually-harassing comments in the workplace from co-workers and supervisors; Plaintiff also heard sexually-harassing comments about a female manager (AG) from Defendant's management (described *supra*).

32. The sexual harassment was severe and pervasive, such that in or about November of 2016, Plaintiff specifically complained to Defendant's management (including but not limited to Mr. Gage and Mr. Midgette) about the sexual harassment towards himself and AG, including sexual harassment coming from managers.

33. Upon information and belief, Plaintiff was also treated disparately on account of his sex (and/or complaints of sexual harassment) by Defendant's management, such as by Defendant re-arranging Plaintiff's schedule to avoid a female employee and/or Defendant enforcing policies selectively against Plaintiff and not against female employees (as discussed *supra*).

34. Defendant never properly investigated nor resolved Plaintiff's aforesaid complaints of sexual harassment and instead responded to Plaintiff with hostility, telling Plaintiff he was "wrong" about raising sexual harassment concerns, and ultimately terminating Plaintiff

for alleged impropriety with AG - rather than properly investigating/resolving Plaintiff's complaints of sexual harassment involving management.

35. In addition to complaining of sexual harassment, Plaintiff also specifically complained to Defendant's management of retaliation/feared retaliation from management (Mr. Gage) for expressing a complaint of sexual harassment (described *supra*).

36. Approximately one (1) week after Plaintiff complained to Defendant's management about sexual harassment and retaliation for complaining of sexual harassment, Plaintiff was terminated by Mr. Gage and Mr. Midgette, the same managers Plaintiff had just complained to/about concerning his aforesaid concerns of sexual harassment and retaliation.

37. Plaintiff believes and therefore avers that he was subjected to a hostile work environment and terminated due to his complaints/reporting of sexual harassment, complaints/reporting of retaliation for complaining of sexual harassment, and/or his sex.

38. Defendant's actions as aforesaid constitute violations of Title VII.

## Count II
## Violation of the New Jersey Law Against Discrimination (NJ LAD)
### ([1] Sex Discrimination [2] Retaliation [3] Hostile Work Environment)

39. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

40. Plaintiff reasserts each and every allegation from Count I, as such actions in this case also constitute violations of the NJ LAD.

41. Therefore, Plaintiff believes and avers he was subjected to a hostile work environment and terminated from Defendant in violation of the NJ LAD due to his complaints about/objections to sexual harassment, complaints of retaliation for complaining of sexual harassment, and/or his sex.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.  Defendant is to be prohibited from continuing to maintain its illegal policy, practice or custom of discriminating/retaliating against employees and is to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto;

B.  Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date he first suffered retaliation/discrimination at the hands of Defendant until the date of verdict;

C.  Plaintiff is to be awarded punitive damages, as permitted by applicable law(s) alleged asserted herein, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.  Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

E.  Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

F.  Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

G. Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

KARPF, KARPF & CERUTTI, P.C.

By: _____
Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square
Building 2, Ste. 128
Bensalem, PA 19020
(215) 639-0801

Dated: August 25, 2017